# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

PATRICIA A. YELDER,

                      Plaintiff,

        v.

DOUG BURGUM, SECRETARY,
DEPARTMENT OF INTERIOR,

                   Defendants.

Case No. 3:21-cv-00153-ACP

**ORDER GRANTING
MOTION FOR
SUMMARY JUDGMENT**
[Dkt. 84]

## I.    INTRODUCTION

Defendant the United States ("Defendant" or "Defendants")[1] filed a motion for summary judgment under Federal Rule of Civil Procedure 56 on September 19, 2025 (the "Motion").[2]

Defendant argues that *pro se* Plaintiff Patricia Yelder ("Plaintiff" or "Ms. Yelder") can show no genuine issue of material fact based on her allegations that her employer, the U.S. Department of Interior's National Park Service ("the Agency" or "NPS"), discriminated against her in violation of her civil rights.[3] Specifically, Plaintiff alleges she was discriminated against based on her race, sex, and disability and retaliated against based

---

[1] The singular and plural are used interchangeably throughout this Order when referring to the defendants due to the claims at least purportedly being brought against the government as well as individuals.

[2] Dkt. 84 (Motion for Summary Judgment).

[3] *Id.* at 1-2.

1

on her prior protected Equal Employment Opportunity activity.[4] As explained below, the Defendant's motion for summary judgment is **GRANTED**.

## II. BACKGROUND

Ms. Yelder is an NPS employee[5] who filed a Complaint for Violation of Civil Rights ("initial complaint") on June 25, 2021.[6] She filed an Amended Complaint for Employment Discrimination on May 12, 2023, "alleging sex discrimination, retaliation for prior protected EEO Activity, and racial discrimination under Title VII, age discrimination under the Age Discrimination in Employment Act, and disability discrimination under the Rehabilitation Act and Americans with Disabilities Act."[7] Upon the Defendants' Federal Rule of Civil Procedure 12(b)(6) Partial Motion to Dismiss,[8] the Court dismissed Ms. Yelder's claims of sex discrimination under Title VII and age discrimination under the ADEA and granted Plaintiff leave to file an amended complaint as to her sex discrimination claim only.[9] Ms. Yelder filed another amended complaint on May 24, 2024,[10] and the Court subsequently ordered Ms. Yelder to identify the specific defendants against whom she was bringing claims.[11] Ms. Yelder refiled the amended complaint ("operative complaint") on

---

[4] *Id.*

[5] Dkt. 1 (Complaint for Violation of Civil Rights).

[6] *Id.* The initial complaint was double-sided and only the odd pages were visible on the docket. Defendants attached a full copy of the initial complaint as an Exhibit to their Motion to Dismiss at Dkt. 13-1.

[7] Dkt. 27 (Amended Complaint for Employment Discrimination).

[8] Dkt. 34 (Order Granting Partial Motion to Dismiss).

[9] *Id.*

[10] Dkt. 46 (Plaintiff Amendment for Sex Discriminating Reasons).

[11] Dkt. 48 (Order Regarding Amended Complaint).

2

June 24, 2024, naming specific defendants.[12] The operative complaint names the following defendants: Deb Haaland, Robyn Burch, Joseph Blaeuer (Human Resources Officer), Trudy Hawkins (Employee Relations Specialist), David Queja, and Sandra Swank (Employee Relations Specialist).[13] The Court indicated that filing would replace Plaintiff's prior amended complaint in its entirety.[14]

### A.    *Defendant's Motion for Summary Judgment.*

Defendant's Motion argues that Plaintiff has failed to identify any cognizable instances of discrimination. Defendant specifically argues that Plaintiff cannot support a claim under Title VII or any other statute for retaliation or discrimination.[15] According to Defendant, Plaintiff cannot support her claims for discrimination on the bases of race or sex, and Plaintiff's hostile work environment claims are not supported by evidence either.[16] Finally, Defendant argues Plaintiff's disparate treatment claim is equally meritless, and she fails to show that the agency did not have legitimate reasons for any actions it took.[17]

### 1.  Undisputed Facts

Defendants draw upon the operative complaint filed at Docket 51 to set forth the facts that are not in dispute.[18] Plaintiff is an NPS employee who has worked for the Agency

---

[12] Dkt. 51 (Plaintiff's Response to Order Regarding Amended Complaint).

[13] Dkt. 51 at 1-2.

[14] Dkt. 48.

[15]  Dkt. 84 at 3-10.

[16] *Id.*

[17] *Id.*

[18] Dkt. 84 at 3-10. The parties have not filed a joint statement of undisputed facts, so the Court is drawing upon the defendants' submission of undisputed facts, cross-checked with

3

since 2011.[19] Plaintiff submits medical documents in support of her claim that she suffers from dysphonia, a vocal cord disorder rendering her unable to speak, and which is triggered only under certain conditions.[20] Plaintiff also injured her wrist and shoulder while at work in March 2016.[21] Plaintiff's claims in this action stem from events that took place in 2016.[22] Plaintiff filed several Equal Employment Opportunity Commission complaints between 2016 and 2018, all of which were resolved in favor of the Agency.[23] Upon leaving federal service in the 1980s, Ms. Yelder was a GS-07, but she was rehired as a GS-05 in 2011.[24]

### 2. *Defendant's Submission of Undisputed Facts.*

Defendant unilaterally submits the following set of undisputed facts:

1.   Plaintiff received a fully successful rating on her FY 2015 Employee Performance Appraisal Plan. Plaintiff's request for reconsideration of her FY 2015 EPAP was denied.[25]

Plaintiff does not deny this.[26]

2.   On March 7, 2016, Joseph Blaeuer told Plaintiff she could use sick leave or report to work in response to Plaintiff emailing him that she was sick.[27]

---

the operative complaint and Plaintiff's Response in Opposition re Motion for Summary Judgment at Dkt. 90.

[19] Dkt. 51 at 4.

[20] Dkt. 27-5 at 11.

[21] Dkt. 84 at 3.

[22] *Id.* at 2.

[23] Dkt. 6-1 (Exhibit to Plaintiff's Response to Order to Show Cause: March 23, 2021 EEOC Final Decision).

[24] Dkt. 84 at 4.

[25] Dkt. 84, Ex. B.

[26] Dkt. 90 (Response in Opposition re Motion for Summary Judgment) at 14.

[27] Dkt. 84, Ex. C, Ex. J at 7-9.

Plaintiff does not deny this.[28]

3.      On April 11, 2016, Plaintiff received a letter of warning for leaving a file cabinet that contained confidential human resources documents unlocked on Thursday, March 17, 2016, failed to notify her supervisor or anyone else of its unsecured status, and it remained unsecured until the following Monday morning.[29]

Plaintiff does not deny this.[30]

4.      On April 15, 2016, Queja emailed Plaintiff stating that since only he and Plaintiff worked in security, and he needed office coverage since it was the busy hiring season, he needed at least one week's notice when possible for when she would schedule appointments, and for emergencies, to be notified as soon as possible.[31]

Plaintiff does not deny this.[32]

5.      As of 4:18pm on Friday, April 15, 2016, the last day of the pay period, Plaintiff had not completed her time sheet. [33] Plaintiff submitted past time sheets late[34].

Plaintiff does not deny this.[35]

6.      On May 16, 2016, Plaintiff sent Queja a request for leave without an explanation, and he responded to her on May 17, 2016, asking what type of appointment for which she was seeking to take leave.[36]

Plaintiff does not deny this.[37]

7.      In order to telework, Plaintiff had to carry her 2.2 pound laptop from the office to her residence. On May 19, 2016, Plaintiff's telework agreement was rescinded because her doctor issued a note that she could not lift more than .3 pounds. After Plaintiff's doctor clarified the restriction, Plaintiff's telework agreement was not reinstated because she failed to fulfill her obligations under the 2016

---

[28] Dkt. 90 at 14.

[29] Dkt. 84, Ex. D, Ex. E at 46-51.

[30] Dkt. 90 at 14.

[31] Dkt. 84, Ex. E at 14, Ex. F at 3.

[32] Dkt. 90 at 14-15.

[33] Dkt. 84, Ex. G at 1.

[34] Dkt. 84, Ex. E at 16-18.

[35] Dkt. 90 at 15.

[36] Dkt. 84, Ex. E at 23, Ex. H at 1.

[37] Dkt. 90 at 15-16.

settlement agreement that allowed her to telework. Plaintiff was never allowed to telework as part of a reasonable accommodation.[38]

Plaintiff does not deny this.[39]

8. On June 30, 2016, Val-Deanna Mortensen emailed Laura Lasell stating that it was her, Mortensen's, fault that Plaintiff's pay was delayed because Mortensen made an error in the timekeeping system.[40]

Plaintiff does not deny this.[41] Plaintiff adds that there was an initial error committed by Laura Lasell and then a second by Val-Deanna Mortensen.[42]

9. It is standard practice for a supervisor in Human Resources in the Alaska Region to enter his or her subordinate's office when they are not there and leave work in their office.[43]

Plaintiff offers no basis for denying this.[44]

10. On July 7, 2016, Plaintiff made a request to Trudy Hawkins that she be allowed to visit a medical specialist.[45] Hawkins spoke with an employee in the Office of Workers' Compensation Programs, and emailed Plaintiff on July 11, 2016, that her request was approved.[46]

Plaintiff does not deny this.[47]

11. The rewriting of Plaintiff's position description and the completion of a desk audit would not impact her grade or pay.[48]

---

[38] Dkt. 84, Ex. J at 26, Ex. E at 59, Ex. K at 5-6, Ex. F at 6-8, Ex. L at 9-10.

[39] Dkt. 90 at 17-18.

[40] Dkt. 84, Ex. M.

[41] Dkt. 90 at 17.

[42] *Id.*

[43] Dkt. 84, Ex. N at 1.

[44] Dkt. 90 at 17-18.

[45] Dkt. 84, Ex. O at 1.

[46] *Id.*

[47] Dkt. 90 at 18.

[48] Dkt. 84, Ex. P at 46-47.

Plaintiff superficially denies this but does not factually deny it.[49] Plaintiff argues that rewriting her position description deprived her of opportunities for advancement and "caused a deadlock[.]"[50]

12. Plaintiff requested Family and Medical Leave Act leave on February 17, 2017 for leave taken in 2016.[51] All dates she requested were credited as FMLA.[52] Because Plaintiff's request was for leave already taken and the Agency must process various FMLA requests, Plaintiff's request was a lower priority than those with leave upcoming.[53]

Plaintiff does not deny this.[54] Plaintiff adds, without basis, that delays in her leave requests being processed are attributable to retaliation.

13. In April of 2017 Plaintiff's supervisor allowed her to switch her day off so she could attend an April 25, 2017 briefing.[55] Plaintiff showed up to the briefing and upon learning it was an active shooter exercise, asked to be excused, and took a day of annual leave to cover her absence.[56] Plaintiff was instructed to attend or apply for annual leave like every other employee.[57] The one other employee who did not attend the active shooter training used annual leave.[58]

Plaintiff does not deny this, again merely characterizing Mr. Queja's actions as retaliation.[59]

14. On June 7, 2017, Trudy Hawkins told Plaintiff that Plaintiff needed to get the background investigations to her as soon as possible because she had an emergency at home and needed to leave soon. Hawkins was not Plaintiff's

---

[49] Dkt. 90 at 18.

[50] *Id.*

[51] Dkt. 84, Ex. Q at 4-5, 20-23.

[52] *Id.*

[53] *Id.*

[54] Dkt. 90 at 19.

[55] Dkt. 84, Ex. I.

[56] *Id.*

[57] Dkt. 84, Ex. S at 8, Ex. U, Ex. I, Ex. T at 4-5.

[58] Dkt. 84, Ex. S at 8.

[59] Dkt. 90 at 19.

supervisor but was responsible for performing backup on adjudicating background investigations.[60]

Plaintiff does not deny this.[61]

15. Queja issued Plaintiff a notice of proposed suspension on September 27, 2017 for failing to keep her door open part way, unless she was engaged in confidential activities. This was a progressive process of discipline that followed (1) a letter of warning for being careless with personally identifying information, (2) two letters of warning for failure to follow instructions, and (3) a letter of reprimand for being careless with PII.[62] At the time Queja issued a notice of proposed suspension, he did not have access to the medical information that Plaintiff subsequently supplied to deciding official Christina Caswell that resulted in the proposed suspension being mitigated to a warning.[63]

Plaintiff does not deny this.[64]

16. On June 11, 2018, Queja held a meeting with Plaintiff and Olivia Colon so Plaintiff's OWCP forms could be timely processed so she could be paid.[65] Plaintiff was rude during the meeting and accused Colon of purposefully delaying her OWCP pay and not knowing how to do her job.[66] When Plaintiff wanted to leave, Queja directed her to stay so they could resolve the OWCP pay issue and ensure Plaintiff was paid on time.[67] Plaintiff did not receive any disciplinary action because of her conduct at the meeting.[68]

Plaintiff does not deny this.[69]

---

[60] Dkt. 84, Ex. V at 5-6.

[61] Dkt. 90 at 19-20.

[62] Dkt. 84, Ex. W at 1-3.

[63] *Id.* at 4-5.

[64] Dkt. 90 at 20.

[65] Dkt. 84, Ex. X.

[66] *Id.*

[67] *Id.*; Dkt. 84, Ex. Y.

[68] Dkt. 84, Ex. X, Ex. A at 5-6.

[69] Dkt. 90 at 20.

8

17. On June 14, 2018, Plaintiff went to Queja's office after hours while he was using a black magic marker for redactions.[70]

Plaintiff does not deny this.[71]

18. Plaintiff had an OWCP injury for her wrist, and her medical provider had her on light/limited duty—she was compensated through OWCP.[72] Due to this, Plaintiff could only work four hours a day.[73] Though Plaintiff claims she has dysphonia, she does not have an OWCP injury for her throat/vocal cords.[74] On October 4, 2018, Plaintiff requested a reasonable accommodation to travel to an out-of-state training.[75] The training required Plaintiff to sit in training for six to eight hours per day.[76] On October 5, 2018, Plaintiff emailed a request for assistance for obtaining a travel approval letter from her physician.[77] On October 10, 2018, the Agency determined that the training would violate Plaintiff's light duty restrictions because she would have to sit for more than four hours a day for both the training class and the flight.[78] Plaintiff received a limited waiver from her physician to attend the eight hour a day training class. The agency found the medical documentation alarming because it was inconsistent with the current work light duty limitations.[79] Plaintiff's job was not impacted by not attending the October training, and the trainings are offered multiple times a year.[80]

Plaintiff does not deny this.[81]

19. On October 18, 2018, Queja issued a memorandum to Plaintiff postponing her scheduled travel and training because she had failed to provide additional

---

[70] Dkt. 84, Ex. A at 7.

[71] Dkt. 90 at 20-21.

[72] Dkt. 84, Ex. Z at 4-6.

[73] *Id.*

[74] *Id.*

[75] Dkt. 84, Ex. AA at 3, Ex. A at 12-15.

[76] *Id.*; Dkt. 84, Ex. Z at 5.

[77] *Id.*; Dkt. 84, Ex. AB at 2.

[78] Dkt. 84, Ex. Z at 4-5.

[79] Dkt. 84, Ex. AA, Ex. AC, Ex. Z at 5-6.

[80] Dkt. 84, Ex. AC at 1-3, Ex. AD.

[81] Dkt. 90 at 21-22.

requested information from her physician.[82] Queja offered to enroll her in the first course in 2019.[83] On November 13, 2018, the Agency requested additional medical documentation from Plaintiff regarding her request for a reasonable accommodation to attend an out-of-state training class, and how she was permitted to do that but not sit in the office for more than four hours a day.[84] According to Defendants, Plaintiff never furnished medical documentation as requested in the November 13, 2018 email.

Plaintiff does not deny this, adding only that the notice was given less than twenty-four hours before departure.[85]

20. On November 23, 2018, Plaintiff submitted OWCP paperwork that contained an error in it, and Olivia Colon submitted Plaintiff's paperwork within timeframes allowed by OWCP.[86] Blaeuer stated that Plaintiff had to submit a weekly CA-7 form to receive OWCP compensation.[87] There was a mistaken belief that this form could be completed before payroll was certified, but this was not correct, and this caused frustration for multiple employees receiving OWCP benefits.[88] The necessary documents were submitted, the issue was resolved, and Plaintiff received all of her compensation.[89]

Plaintiff does not deny this.[90]

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party moving for summary judgment bears

---

[82] Dkt. 84, Ex. AD, Ex. AE.

[83] Dkt. 84, Ex. AD.

[84] Dkt. 84, Ex. AE.

[85] Dkt. 90 at 22.

[86] Dkt. 84, Ex. AG at PDF 6.

[87] Dkt. 84, Ex. Z at 11.

[88] *Id.*

[89] *Id.*

[90] Dkt. 90 at 22-23.

the initial burden of demonstrating the absence of a genuine issue of fact for trial."[91] However, "[w]hen the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'"[92] If the movant meets their burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[93] The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[94] In deciding a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[95]

The Court examines discrimination and retaliation claims using the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). "Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was

---

[91] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[92] *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325).

[93] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

[94] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citations omitted).

[95] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

11

pretextual."[96] "[T]he plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"[97]

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[98] "[T]he term 'discriminate against a qualified individual on the basis of disability' includes [] not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[99]

Section 504 of the Rehabilitation Act states "[n]o otherwise qualified individual with a disability [] shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[100]

---

[96] *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (citations omitted).

[97] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

[98] 42 U.S.C. § 12112(a).

[99] 42 U.S.C. § 12112(b)(5)(A).

[100] 29 U.S.C. § 794(a).

12

It is unlawful under the ADEA for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[101] As with other discrimination and retaliation claims, a plaintiff can show discrimination using the *McDonnell Douglas* framework. A showing of but-for causation is required to establish that an employer took an adverse action against the employee because of age.[102]

## IV. ANALYSIS

### A. Named defendants.

At the outset, the Court addresses the uncertainty in this action over the identity of the named defendants. As discussed above, Plaintiff's operative complaint lists a panoply of NPS employees.[103] Several of the employees against whom allegations are made no longer work at the National Park Service.[104] Under Federal Rule of Civil Procedure 25(d), when a public official who is sued in their "official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party." Doug Burgum has been substituted as a defendant for Walter Cruickshank, who was substituted for Deb Haaland, as Secretary of the Interior. According to the case caption, Joseph Blaeuer and Robyn Burch are not currently part of NPS.

---

[101] 29 U.S.C. § 623(a)(1).

[102] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

[103] Dkt. 51 at 1-2.

[104] *See, e.g.*, Docket Annotation dated January 24, 2025, substituting Deb Haaland for Walter Cruickshank.

The United States filed the Motion as a defendant, but no party has made any allegations in the moving papers concerning i) whether the accusations against the individual defendants named are in connection with actions taken in their official capacity ii) sovereign immunity[105] or iii) the appropriateness of substituting the United States as defendant for the named defendants.

First, the Court construes *pro se* litigants' complaints liberally.[106] Plaintiff's initial complaint indicates she is filing a *Bivens* claim.[107] However, in the Court's order on May 29, 2024, the Court instructed Plaintiff to resubmit her amended complaint with the knowledge that the resubmitted complaint would substitute the initial complaint entirely.[108] The Ninth Circuit has "presumed that officials necessarily are sued in their personal capacities where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued."[109]

The Court construes the operative complaint as a suit against the Secretary of the Interior, as well as employees David Queja, Robyn Burch, and Joseph Blaeuer, in their personal capacities.[110]

---

[105] No party makes sovereign immunity arguments here. Title VII allows suits against the federal government. Title VII, 42 U.S.C. § 2000e-16.

[106] *See Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).

[107] Dkt. 1 at PDF 2.

[108] Dkt. 48 at 2 ("The amended complaint will replace the prior complaint in its entirety." (citing Fed. R. Civ. P. 15)).

[109] *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999).

[110] The Motion for Summary Judgment was filed by "[t]he United States[.]" Dkt. 84 at 1. On reply, Defendants represent that they file for "Defendant Doug Burgum, Secretary, Department of Interior (National Park Service), in his official capacity[.]" Dkt. 93 at 1. The

14

## B. *Failure to raise genuine issues of material fact.*

The Court agrees with Defendants that Plaintiff fails to raise genuine issues of fact sufficient to defeat summary judgment. Plaintiff tries to do so by reciting the actions taken by her employer and identifying what she believes were the motivations for those actions. However, Plaintiff's own Response in Opposition re Motion for Summary Judgment demonstrates that she does not meaningfully contest the Undisputed Facts as set forth by Defendants. Her supplementations to those facts provide extensive commentary on why, in her opinion, the NPS took the actions they did, and the negative ways in which those actions impacted her. However, Plaintiff provides no factual basis, even making all inferences in her favor, allowing the Court to conclude discriminatory intent was behind these actions, and Plaintiff cannot establish that the Agency lacked legitimate reasons for any of its actions.

## C. *Plaintiff cannot support a claim under Title VII.*

### 1. *Plaintiff fails to provide evidence establishing discrimination on the basis of sex.*

"[A] Title VII plaintiff alleging sex discrimination can establish a prima facie case by showing that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably, or her position was filled by a man."[111]

---

Court, given the context of the proceedings, construes the instant motion as covering all defendants, whether sued in their personal or official capacities.

[111] *Lui v. DeJoy*, 129 F.4th 770, 777 (9th Cir. 2025) (citation modified, internal citation omitted).

15

Plaintiff's sex discrimination claims are purely speculatory. Plaintiff claimed at deposition that she was discriminated against based on being a woman and for having previously filed a Merit Systems Protection Board claim.[112] The parties do not dispute that Plaintiff is a member of a protected class and that she is qualified for the position.

Plaintiff recites the following as possible examples of an adverse employment action: being disallowed a promotion; being ejected from a training; being possibly the oldest attendee in a particular training; not being selected for a promotion despite meeting the minimum qualifications; not being given telework privileges; allegedly being followed at work; allegedly being exposed to Sharpie markers; being asked by a supervisor whether Plaintiff had a hair or medical appointment; the processing of Plaintiff's FMLA request being delayed.[113]

Many of these may not qualify as adverse employment actions. However, more to the point, Plaintiff does not establish that similarly situated men were treated more favorably, and she does not establish that her position was filled by a man. The closest Plaintiff comes to establishing this is pointing to a single privilege – telework – of which she was deprived while others were not.[114] However, despite Plaintiff claiming that others were granted telework privileges, which Defendants do not deny, Plaintiff fails to show that the other employees were men who were similarly situated to Plaintiff.

---

[112] Dkt. 84, Ex. R at 252:17-253:14.
[113] Dkt. 90 at 3, 17, 20, 28, 42, 50.
[114] Dkt. 84, Ex. R at 219:22-219:25.

Individuals who do similar work and display similar conduct are similarly situated.[115] Plaintiff points to one individual who was allegedly granted telework privileges at NPS, which Defendants do not deny, but there is no evidence that he and Plaintiff had similar jobs, and there is no evidence that he and Plaintiff displayed similar conduct.[116]

### a. Plaintiff fails to provide evidence establishing retaliation.

Establishing a prima facie case of retaliation under Title VII requires showing (1) involvement in a protected activity under the statute, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse employment action.[117] Plaintiff does not meet this burden.

There is no dispute that Plaintiff engaged in protected activity, at minimum, by filing an EEOC complaint.[118] However, many of the actions taken by the Agency do not necessarily amount to adverse employment actions. Furthermore, Plaintiff fails to provide a causal link between the protected activity and any alleged adverse employment action.[119]

---

[115] *See Vasquez v. City of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2006) ("Individuals are similarly situated when they have similar jobs and display similar conduct.").

[116] Dkt. 84, Ex. R at 218:23-219:21.

[117] *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012).

[118] Dkt. 24 at 22.

[119] Dkt. 90 at 38, 53 (repeating the conclusory allegation that "[t]he retaliation factor is crucial."). The most Plaintiff can muster is a conclusory allegation that a supervisor broke a promise to her about not requiring her to take leave during a training she wished not to attend. Dkt. 90 at 19. Even if true that Defendant Queja broke this promise to Plaintiff, and even if true that it were retaliatory, this would not be sufficiently connected to a meaningfully adverse employment action.

### b. *Plaintiff fails to provide evidence establishing a hostile work environment.*

The Court examines three factors on a hostile work environment claim involving allegations of sexual harassment: 1) whether the Plaintiff was "subjected to verbal or physical conduct of a sexual nature; 2) whether the conduct was unwelcome; and 3) whether the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."[120]

Plaintiff describes an awkward interaction in which she circled around Queja while he was sitting at his desk, he stood up, and grabbed her by the arm, ostensibly to direct her away from his workplace. Plaintiff provides no explanation for having entered her supervisor's personal space or placing herself behind him, and it is understandable why both parties would feel uncomfortable in a situation like this. Nevertheless, while both parties may have engaged in conduct that was unwelcome, Plaintiff does not establish that she was subjected to verbal or physical conduct of a harassing nature adequately pervasive or severe to alter the terms of her employment or create an abusive environment. In short, the conduct described does not meet the standard for a hostile work environment claim.

The same is true for the other alleged incidents that Plaintiff claims contributed to a hostile work environment, which are basically tantamount to Queja having walked too close to Plaintiff on a few occasions over the course of the year. These latter examples ring of cherry-picking or even fully manufactured disputes for the purpose of creating a pattern

---

[120] *Okonowsky v. Garland*, 109 F.4th 1166, 1178 (9th Cir. 2024) (citation modified, internal citation omitted).

of unwelcome behavior instead of only one instance. Even if true, and drawing all inferences in Plaintiff's favor, Plaintiff does not demonstrate that these events changed the terms or conditions of her employment.

### 2. *Plaintiff cannot sustain a claim for race discrimination.*

As discussed above, Plaintiff's complaint was dismissed as to all claims except sex discrimination.[121] Plaintiff points to a single instance of alleged racial discrimination, in which defendant Queja referred to her as a "scape monkey" in April 2016. Regardless of whether this was a racially motivated comment or a botched attempt to use the common idiom "scapegoat," Plaintiff still fails to establish the required elements for a Title VII claim based on racial discrimination. Even assuming this comment was racially motivated, a single comment by one supervisor does not amount to discrimination.[122] More importantly, Plaintiff fails to link this to any adverse employment action taken against her.

Plaintiff claims to have been subjected to another instance of racial animosity when asked whether an appointment she was planning to attend was a haircut or medical appointment. As Defendants state, personal leave and sick leave are different ways for federal employees to legitimately take time away from work. Without Plaintiff having described what kind of appointment she needed to attend, it is fair for a supervisor to inquire into the nature of the requested leave. Moreover, haircuts are not medical appointments. Additionally, at deposition, Plaintiff described her own hairstyle as an

---

[121] Dkt. 34 at 8.

[122] *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990)) (rejecting the argument that a single use of the term "brother" could give rise to a discrimination claim because "'[s]tray' remarks are insufficient to establish discrimination").

"ethnic haircut."[123] None of this is persuasive that the conversation surrounding the nature of Plaintiff's appointment rises to racially motivated activity, and even if it did, Plaintiff's claim fails for the same reasons set forth above.

### D. *Plaintiff cannot sustain a claim under the Rehabilitation Act or the Americans with Disabilities Act.*

As discussed above, Plaintiff's complaint was dismissed as to all claims except sex discrimination.[124] In any event, Plaintiff provides evidence that she suffers from dysphonia, a condition which makes it difficult or even impossible for her to speak sometimes.[125] Plaintiff makes a compelling case that she suffers from this genuine disability and that it has caused her distress.[126] What Plaintiff does not do, however, is connect the disability to any discrimination experienced because of it. Plaintiff makes limited allegations regarding any request for accommodation, much less the denial of any accommodation. Her arguments in opposition are two short paragraphs addressing i) the length of time that she has had this disability and ii) the extent to which it has interfered with life activities.

### E. *Plaintiff is unable to sustain a claim under the Age Discrimination in Employment Act.*

As discussed above, the Court dismissed Plaintiff's ADEA claims, along with her Title VII sex discrimination claims, in its January 24, 2024 Order partially granting

---

[123] The Court acknowledges that ethnicity and race are not interchangeable, although they often overlap and are used interchangeably in everyday conversation.
[124] Dkt. 34 at 8.
[125] Dkt. 27-5 at 11.
[126] Dkt. 51 at 10-11.

defendants' motion to dismiss.[127] All claims except the sex discrimination claims were dismissed with prejudice.[128] While the January 24, 2024 Order expressly allows for the refiling of Plaintiff's sex discrimination claims only, for the sake of thoroughness, the Court addresses all of Plaintiff's claims here. Plaintiff's scattered allegations regarding age discrimination are unsupported.[129] For the same reasons Plaintiff cannot sustain her other claims, she cannot sustain a claim under the ADEA. Speculation that Plaintiff was treated differently due to her age, without evidence to support it, is not enough to create a triable issue of fact.

### F. *Plaintiff cannot show the Agency lacked legitimate reasons for its actions.*

Defendants set forth the events complained of in Plaintiff's EEOC appeal.[130] Defendants explain why each of these actions is legitimate, and Plaintiff offers no basis upon which the Court can conclude otherwise. Plaintiff has not made a compelling prima facie case of sex discrimination. Even if she had, the Agency shows that it had legitimate reasons for its actions. Furthermore, Plaintiff provides no evidence that these motivations were pretextual.

---

[127] Dkt. 34.
[128] *Id.* at 8.
[129] Dkt. 84 at 18, 22, 30.
[130] Dkt. 6-1; Dkt. 84 at 28-41.

### 1. *Non-discriminatory reason for Queja directing Plaintiff to remain at a June 11, 2018 meeting.*

The meeting occurred, according to Defendant, so that Plaintiff's OWCP paperwork could be processed, allowing her to be paid.[131] There is nothing discriminatory about requiring Plaintiff to stay at a meeting, and she provides no reason to believe otherwise.

### 2. *Non-discriminatory reason for Queja instructing Plaintiff to meet with him in his office after he used a Sharpie.*

Defendant Queja was using a marker in his own office.[132] There is nothing unusual about using markers at work, and if Plaintiff wished not to be exposed to them, she could have avoided Queja's office.

### 3. *Non-discriminatory reason for Plaintiff being prevented from attending a training class on October 4, 2018/postponing her travel on October 19, 2018.*

The Agency argues that it was doing its best to follow Plaintiff's physician's recommendations limiting her to light duty and limited work.[133] Despite Plaintiff obtaining a waiver from her physician so that she could attend the training, the Agency elected to preclude her from this particular training, rescheduling her to a later date.[134]

On opposition, Plaintiff attacks the Agency's motivations for taking this action, conveying her belief that the Agency wished to deprive her of training received by her peers. Plaintiff could be correct that one or more of her supervisors were so motivated, but even if true, it still would not show that NPS lacked a legitimate basis for its decision.

---

[131] Dkt. 84, Ex. A at 5-6; Ex. X.
[132] Dkt. 84, Ex. A at 7.
[133] Dkt. 84 at 29.
[134] *Id.*

### 4. *Nondiscriminatory reason for failing to submit documentation for Plaintiff to receive OWCP payments on November 23, 2018.*

At most, if true, this would entitle Plaintiff to damages for the money she did not receive and was entitled to, but the Agency states that "[t]he necessary documents were submitted and the issue was resolved."[135] Plaintiff does not contest this.

### 5. *Nondiscriminatory reason for failing to respond to her February 21, 2017 request for FMLA leave.*

NPS alleges the delay was a result of Plaintiff herself failing to provide a needed medical certification, and Plaintiff does not contest this, arguing that the delay is attributable to "[r]etaliation[.]"[136] In any event, the leave in question was for leave already taken, according to Defendants, which Plaintiff does not deny. Employees are not entitled to retroactive FMLA leave.[137] The Agency provided Plaintiff with retroactive FMLA leave anyway.

### 6. *Nondiscriminatory reason for sharing medical records.*

Despite discovery being complete, Plaintiff is unable to show that any of her medical records were released to anyone other than those who were authorized and needed to have them for the purpose of assessing reasonable accommodations.[138]

---

[135] Dkt. 84 at 30.

[136] Dkt. 84 at 30; Dkt. 90 at 50.

[137] 5 C.F.R. § 630.1203(b) ("An employee may not retroactively invoke his or her entitlement to family and medical leave.").

[138] Ms. Yelder states that she shared her medical information with an Equal Employment Opportunity investigator and expresses frustration at Defendant Swank having done the same without Plaintiff's permission. Dkt. 90 at 50-51. An employer may share otherwise confidential medical information of an employee with government officials investigating compliance with the Americans with Disabilities Act. 42 U.S.C. § 12112(d)(3)(B)((iii)

23

### 7. Plaintiff's June 7, 2017 adjudication request addressed in a defensive and condescending tone.

Defensive and condescending workplace communications, while frowned upon, do not alone meet the bar for Title VII or any other discrimination claims.

### 8. Nondiscriminatory reason for supervisor, on April 25, 2017, instructing her to use annual leave after previously agreeing to allow her to switch her regular day off to attend a mandatory training.

Plaintiff wished not to attend the mandatory training.[139] On opposition, Plaintiff explains her disappointment that Queja initially agreed to allow her to skip it but reversed course after discussing it with Ms. Burch.[140] However, this alone does not erase the Agency's legitimate basis for instructing Plaintiff to take leave for time she wished not to work.

### 9. Nondiscriminatory reason for issuing Plaintiff a proposed suspension on September 27, 2017.

The Agency states that it engaged in progressive discipline against Plaintiff for failing to follow instructions and provides documentation in support of its claim.[141] Plaintiff provides no reason to believe the Agency lacked a legitimate basis for its actions.

### 10. Nondiscriminatory reason the Agency responded in the manner it did to Plaintiff's March 7, 2016 request to use sick leave.

The Agency states that, Blaeuer, Plaintiff's acting supervisor, directed Plaintiff to take sick leave when she had a fever of 102 degrees Fahrenheit and wished not to come to

---

("government officials investigating compliance with this chapter shall be provided relevant information on request").

[139] Dkt. 90 at 51.

[140] *Id.*

[141] Dkt. 84, Ex. W.

the office.[142] On opposition, Plaintiff expresses that she was upset by this and wished to be permitted to telework.[143] Plaintiff makes no claim that sick leave was unavailable to her for any reason, and it is legitimate for an employer to deny an employee's telework request.

### 11. Nondiscriminatory reason for telling Plaintiff she needed prior approval before making medical appointments on April 14, 2016 and June 10, 2016.

NPS states that Queja requested that Plaintiff provide advance notice for any upcoming medical appointments on April 14 and June 10, 2016 because the spring and summer are unusually busy times of the year.[144] Plaintiff's response is: "The retaliation factor is crucial. Mr. Queja controlled when I was allowed to seek medical treatment. He demanded I inform him before scheduling doctor's appointments when doctors do not schedule their appointments around a supervisor."[145]

If true that Defendant controlled when Plaintiff could or could not make medical appointments, that would be a disturbing overreach, but Plaintiff provides no evidence of this. Plaintiff alleges this, without basis, and while the parties do not specify how much advance notice Defendant wanted from Plaintiff, it is legitimate for an employer to request some advance notice for scheduled medical leave.

---

[142] Dkt. 84, Ex. C, Ex. J at 7-9.
[143] Dkt. 90 at 52-53.
[144] Dkt. 84 at 32-33.
[145] Dkt. 90 at 53 (formatting modified).

25

### 12. *Nondiscriminatory reason for accusing Plaintiff of not doing her timecard on April 15, 2016.*

Defendant Queja reminded Plaintiff to complete her timecard because she had failed to complete her prior timecard on time.[146] Moreover, despite failing to complete her timecard on time again, the administrative officer verified her timecard so that she could get paid on time.[147] Plaintiff presents no evidence that the Agency lacked a legitimate basis for reminding her to complete her timecard on time.

### 13. *Nondiscriminatory reason for Plaintiff's supervisor chastising her on April 18, 2016.*

Plaintiff attributes difficulties logging into a new online portal to workplace discrimination without setting forth any evidence to support her claim.[148] The Agency states that all staff were required to use this platform and that Defendant Queja emailed all of his staff informing them how to use it.[149] Directing Plaintiff, along with all other employees, to use an online platform mandatory for all employees is not workplace discrimination, and in the absence of any evidence, Plaintiff's difficulties using the platform do not change that.

---

[146] Dkt. 84, Ex. G at 1, Ex. E at 16.

[147] Dkt. 84 at 33.

[148] Dkt. 90 at 54 ("In my opinion, this incident shows that Mr. Queja was told or given instructions not to train me. He did not want to help me in this matter." (formatting modified)).

[149] Dkt. 84, Ex. E at 19-20.

26

### 14. Nondiscriminatory reason for Queja asking Plaintiff if she had a hair or medical appointment on May 16, 2016.

This has been addressed above. The Court acknowledges that this inquiry could have been framed better, e.g., Defendant Queja could have simply confirmed whether the appointment was medical or not. Nevertheless, a single inquiry that goes beyond the bounds of normal supervisor-supervisee exchanges regarding leave time, or even a single microaggression, does not amount to workplace discrimination.

### 15. Nondiscriminatory reason for assigning additional duties on June 1, 2016.

The reward for good work is often more work. There is nothing discriminatory about assigning an employee additional duties, particularly when the work assigned is appropriate for her. Plaintiff gives no reason to believe that requiring her to do the additional work assigned was in any way against medical advice. Plaintiff claims that this was designed to injure her and not in conformity with medical guidance, but she provides no evidence to that effect.

### 16. Nondiscriminatory reason for delaying timesheet certification and pay on June 28, 2016 and July 13, 2016.

NPS states that a payroll error caused Plaintiff's pay to be delayed and that the situation was rectified within a few days of the incident.[150] Plaintiff believes that the delay in receiving her pay was deliberate and racially motivated, but she provides no evidence of this.[151] While receiving pay later than expected is unfortunate, at most, this would entitle

---

[150] Dkt. 84, Ex. P at 20.
[151] Dkt. 90 at 55.

Plaintiff to the pay she has already received anyway. While NPS may not have had a legitimate reason to delay paying Plaintiff, there was no reason to believe this was not an accident. In any event, Plaintiff cannot credibly claim that she was harmed due to workplace discrimination in connection with this because she was in fact paid. In addition, Plaintiff brings no other such incidents to the Court's attention.

### 17. *Nondiscriminatory reason for Plaintiff's supervisor entering her office on July 7, 2016/leaving documents on her chair while she was on light duty.*

The Agency explains that Defendant Queja enters Plaintiff's office because they both work in Human Resources, Plaintiff's office must therefore remain locked while she is not in it, and Queja carries files to her office because Plaintiff has a workplace lifting restriction.[152] Plaintiff does not contest any of this. She states that this made her feel as though her privacy was invaded, that Defendant's intent was to intimidate, and that entry into her office was investigative for the purpose of trying to find reasons to terminate her employment.

The Agency provides a legitimate basis for entering Plaintiff's office. In the absence of the lifting restriction, there could be a workaround, but because of it, Defendant not only has a legitimate basis for entering Plaintiff's office, but there appear to be few, if any, alternatives.

---

[152] Dkt. 84, Ex. E at 32, Ex. N.

### 18. Nondiscriminatory reason for Plaintiff's supervisor asking her to leave a training class on July 12, 2016.

NPS states that "Plaintiff was not on the roster to attend the class."[153] This alone is a sufficient basis for Defendant Queja to prohibit Plaintiff from attending the class, but in addition, she was behind on her work.[154] Plaintiff argues that this humiliated her but provides no basis upon which the Court could conclude that this was not a legitimate employer prerogative.

### 19. Nondiscriminatory reason for providing Plaintiff with April 11, 2016 letter of warning.

The Agency issued Plaintiff a written warning for failing to secure an HR file cabinet containing Personally Identifiable Information.[155] Plaintiff alleges that she "tried to inform [her] supervisor about" a broken lock, presumably in connection with this incident, but she provides no emails or other documentation of this attempt.[156] In the absence of this, the Court cannot conclude that NPS lacked a legitimate basis for issuing this warning, regardless of whether this amounts to an adverse employment action.

### 20. Nondiscriminatory reason Plaintiff was not selected for GS-07/12 position on May 24, 2016.

The Agency had another outstanding GS-12 hiring certificate and chose to use that for two qualified candidates instead of hiring someone at the GS-07 level.[157] In addition, upon Defendant Blaeuer checking Plaintiff's references, it was determined that she had not

---

[153] Dkt. 84 at 35.
[154] Dkt. 84, Ex. E at 36-37.
[155] Dkt. 84, Ex. P at 39, Ex. E at 46-47.
[156] Dkt. 90 at 57.
[157] Dkt. 84, Ex. J at 21-22.

29

performed work she claimed to have performed, but the Agency took no disciplinary action.[158]

Making hiring choices is a legitimate employer action, and Plaintiff's dissatisfaction with not being selected does not amount to discrimination.

### 21. Nondiscriminatory reason for denying reasonable accommodations on April 20, 21, 29, and June 10, 2016.

Defendant admits it denied Plaintiff's reasonable accommodation requests.[159] While Defendant's explanation for doing so is a little mysterious in that the reason for doing so shifts, the Agency has some amount of discretion in this matter.[160]

First, employers may deny reasonable accommodation requests that would prevent an employee from fulfilling the essential duties of their job.[161] Because Plaintiff's job functions included issuing badges and other tasks requiring her presence at the office, full-time telework would have prevented her from performing the essential functions of her job.[162] Second, it is legitimate for employers to request additional documentation to support a reasonable accommodation request if the documentation provided is not sufficiently detailed to allow the employer to make a decision.[163] Third, while the Agency did not

---

[158] Dkt. AI at 18-19.

[159] Dkt. 84 at 37-38.

[160] *Id.*

[161] *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012) (affirming grant of summary judgment in favor of employer against neonatal intensive care unit nurse who sought exemption from employer's attendance policy).

[162] Dkt. 84, Ex. E at 56.

[163] *See Brooks v. Agate Res., Inc.*, No. 6:15-CV-00983-MK, 2019 WL 2635594, at *8 (D. Or. Mar. 25, 2019) ("Defendant would have been well within its rights to request further information about Plaintiff's alleged disability."), *report and recommendation adopted*,

accommodate Plaintiff in the sense that it allowed her to telework full-time, as recommended by her physician, it did allow her to telework part-time, albeit as part of a settlement agreement rather than reasonable accommodation.[164] Finally, Defendant alleges, and Plaintiff does not dispute, that Plaintiff never responded to Defendant's offer to move her office within the Agency's building.[165] Employees are obligated to engage in the interactive process to find a reasonable accommodation, and at the point at which Plaintiff stopped responding, she stopped engaging in the interactive process. Without ever having resumed it, it is fair to conclude that she abandoned the interactive process.

### 22. *Nondiscriminatory reason for rescinding telework on May 19, 2016.*

Defendant argues that rescinding Plaintiff's telework was a legitimate action because it was not part of a reasonable accommodation but a settlement.[166] The settlement agreement required Plaintiff to complete certain tasks within a particular timeframe.[167] According to Defendant, Plaintiff failed to comply with the terms of this agreement.[168]

---

No. 6:15-CV-000983-MK, 2019 WL 2156955 (D. Or. May 14, 2019), *aff'd*, 836 F. App'x 471 (9th Cir. 2020) (recognizing right of employer to request additional documentation in connection with reasonable accommodation when related to needs of business); *see also Chandler v. DeJoy*, 714 F. Supp. 3d 1108, 1142 (D. Ariz. 2024) (reasoning that both employer and employee must participate in the interactive process of finding an appropriate reasonable accommodation), *aff'd*, No. 24-1265, 2025 WL 1404947 (9th Cir. May 15, 2025).

[164] Dkt. 84 at 37-38.

[165] Dkt. 84 at 37.

[166] Dkt. 84 at 38.

[167] Dkt. 84, Ex. L ¶ 24.

[168] Dkt. 84, Ex. AI at 30-31.

Additionally, Plaintiff submitted an OWCP form from her doctor on May 19, which indicated she was unable to lift more than .3 pounds.[169] Plaintiff's government-issued laptop weighs more than this, so Defendant Queja stopped Plaintiff from teleworking.[170] After the restriction was lifted, Defendant did not reinstate Plaintiff's telework because she was not in compliance with the parties' settlement agreement.[171]

Plaintiff does not meaningfully contest this, admitting that she was unable to complete her work due to the worsening of her medical condition.[172] The Agency therefore had a legitimate basis to revoke Plaintiff's telework arrangement.

### 23. *Nondiscriminatory reason for going into Plaintiff's office when she was on LWOP status.*

Defendant provides at least two legitimate reasons for entering Plaintiff's office while she was on LWOP status. First, Defendants Burch and Queja moved fingerprinting equipment into her office because she would be performing fingerprinting duties.[173] Second, Plaintiff's office contained unsecured documents containing PII intermingled with personal items, so Defendant Queja separated Plaintiff's personal items and placed them in a box.[174] The Agency has demonstrated legitimate bases for taking this action.

---

[169] Dkt. 84, Ex. E at 59.
[170] Dkt. 84, Ex. E at 59.
[171] Dkt. 84 at 38-39.
[172] Dkt. 90 at 60.
[173] Dkt. 84, Ex. AK at 1.
[174] Dkt. 84, Ex. AK at 2.

### 24. *Nondiscriminatory reason for supervisor requesting information on February 10, 2017 that Plaintiff believed was covered under HIPAA.*

Defendant requested medical documentation to support Plaintiff's request for leave, which was allegedly related to a prior workplace injury.[175] In addition, Plaintiff provides no reason to believe that this was in violation of HIPAA. Plaintiff provides no way for the Court to find that the agency lacked a legitimate basis for this action, arguing only that she was "repeatedly singled out."[176]

### 25. *Nondiscriminatory reason for Plaintiff not receiving 2016 performance appraisal by March 2017.*

Plaintiff returned to work on January 17, 2017 after a lengthy absence.[177] Defendant Queja provided Plaintiff with an Employee Performance Appraisal Plan in March because, in the interim, he was seeking advice from in-house counsel.[178] Plaintiff again does not connect this to any harm she suffered, and the Court cannot conclude that the Agency lacked a legitimate basis for the delay.

### 26. *Nondiscriminatory reason for placing a sign on Plaintiff's door to indicate whether she was available on February 10, 2017.*

Defendant states that Defendant Queja required Plaintiff to indicate her availability with a sign on her door because Plaintiff's work requires her to be available to assist employees, but she works with the door closed and lights off.[179] The Agency had a legitimate basis for directing Plaintiff to indicate her availability, particularly because her

---

[175] Dkt. 84, Ex. AL at 2.
[176] Dkt. 90 at 62.
[177] Dkt. 84 at 40.
[178] Dkt. 84, Ex. AL at 12-13.
[179] Dkt. 84, Ex. AL at 24.

work requires her to interact with other employees and, due to a reasonable accommodation, she works with her door closed and the lights off.

### 27. *Nondiscriminatory reason for rejecting reconsideration of Plaintiff's 2015 annual appraisal*.

Plaintiff formally requested reconsideration of her 2015 evaluation.[180] Defendant denied this request because Plaintiff failed to submit documentation warranting it.[181] The Agency had a legitimate reason for denying Plaintiff's request for reconsideration, and Plaintiff provides no evidence to the contrary.

### V. CONCLUSION

For the above stated reasons, summary judgment is **GRANTED** in favor of Defendant. For the vast majority of Plaintiff's claims, she has failed to make out a *prima facie* case of discrimination under Title VII, the ADA, the ADEA, or the Rehabilitation Act, to include retaliation, race discrimination, and sex discrimination. Concerning the few instances in which Plaintiff may have suffered an adverse employment action, even if the circumstances did allow an inference of discrimination, NPS has shown legitimate bases

---

[180] Dkt. 84, Ex. AO at 5.
[181] Dkt. 84, Ex. B.

for each of its actions taken. Finally, Plaintiff has not shown that any of these actions is merely a pretext for discrimination.

IT IS SO ORDERED.

DATED at Anchorage, Alaska, this 18th day of May, 2026.

/s/ *Aaron Christian Peterson*
Aaron Christian Peterson
United States District Judge